| CR 12 (Rev. 5/03) | WARRANT FOR ARREST | 1:12-mj-646 |
|---|---|---|

| United States District Court | DISTRICT<br>SOUTHERN DISTRICT OF NEW YORK | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>SEYED AMIN GHORASHI SARVESTANI,<br>a/k/a "Amin Ghorashi,"<br>a/k/a "Amin Gorechi," | DOCKET NO.<br>12 MAG 2588 | MAGISTRATE'S CASE NO. |
| | NAME AND ADDRESS OF INDIVIDUAL TO BE ARRESTED<br>SEYED AMIN GHORASHI SARVESTANI,<br>a/k/a "Amin Ghorashi,"<br>a/k/a "Amin Gorechi," | |
| WARRANT ISSUED ON THE BASIS OF:   ☐ Order of Court<br>☐ Indictment   ☐ Information   X Complaint | DISTRICT OF ARREST | |
| TO: UNITED STATES MARSHAL OR ANY OTHER AUTHORIZED OFFICER | CITY | |

YOU ARE HEREBY COMMANDED to arrest the above-named person and bring that person before the United States District Court to answer to the charge(s) listed below.

### DESCRIPTION OF CHARGES

Conspiracy to violate export regulations

| IN VIOLATION OF | UNITED STATES CODE TITLE<br>50 | SECTION<br>1705 |
|---|---|---|
| | BAIL | OTHER CONDITIONS OF RELEASE |
| ORDERED BY | SIGNATURE (FEDERAL JUDGE/U.S. MAGISTRATE)<br>S/ Frank Maas | DATE ORDERED<br>10-3-12 |
| CLERK OF COURT | FRANK MAAS (BY) DEPUTY CLERK<br>United States Magistrate Judge<br>Southern District of New York | DATE ISSUED |

### RETURN

This warrant was received and executed with the arrest of the above-named person.

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE EXECUTED | | |

Note: The arresting officer is directed to serve the attached copy of the charge on the defendant at the time this warrant is executed.

Approved: _____
JASON B. SMITH/RACHEL P. KOVNER
Assistant United States Attorneys

Before:   THE HONORABLE FRANK MAAS
          United States Magistrate Judge
          Southern District of New York

**12 MAG 2588**

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA         :    SEALED COMPLAINT

       - v. -                    :    Violation of
                                      50 U.S.C. § 1705
SEYED AMIN GHORASHI SARVESTANI,  :
    a/k/a "Amin Ghorashi,"            COUNTY OF OFFENSE:
    a/k/a "Amin Gorechi,"        :    NEW YORK

       Defendant.                :

- - - - - - - - - - - - - - - - - x

COUNTY OF NEW YORK       )
STATE OF NEW YORK        ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

Special Agent Brian Surer, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE: CONSPIRACY TO VIOLATE THE INTERNATIONAL EMERGENCY ECONOMIC POWERS ACT ("IEEPA")

1. From at least in or about November 2005, up to and including in or about November 2011, in the Southern District of New York and elsewhere, SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to violate, and to cause a violation of, licenses, orders, regulations, and prohibitions issued under the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1701 to 1707 and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204 (collectively, "IEEPA").

2. It was a part and an object of the conspiracy that SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, and others known and unknown, would and did export, re-export, cause to be exported and re-exported, sell, and supply, directly and indirectly, from the

United States, goods, technology, and services, to wit, satellite telemetry and electronics equipment supplied by companies in the United States, to customers located in Iran, without obtaining the required approval of the Office of Foreign Assets Control, within the United States Department of Treasury, in violation of Title 50, United States Code, Sections 1701 to 1707 and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

### Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, and others known and unknown, committed the following overt acts, in the Southern District of New York and elsewhere:

   a. In or about April 2011, a co-conspirator not named as a defendant herein caused approximately $16,947 to be sent via wire transfer from a bank located in New York, New York, to a business located in Virginia Beach, Virginia ("SUPPLIER-1"), as payment for a purchase of goods from SUPPLIER-1.

   b. In or about September 2011, GHORASHI caused a check to be issued in the amount of 1,180,418.80 United Arab Emirate Dirhams in order to purchase electronics components from a United States supplier that were subsequently shipped to Iran via Hong Kong.

(Title 50, United States Code, Section 1705)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am a Special Agent of the FBI, and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with law enforcement agents and others and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents or communications and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### I. LEGAL BACKGROUND

5. By virtue of the IEEPA, Title 50, United States Code, Sections 1701-05, the President was granted authority to deal with unusual and extraordinary threats to the national

security and foreign policy of the United States. See 50 U.S.C. §§ 1701, 1702. On March 15, 1995, the President issued Executive Order 12957, finding that the actions and policies of the Government of Iran constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and on that date declared a national emergency to deal with that threat. See Exec. Order No. 12957, 60 Fed. Reg. 14615 (March 15, 1995). On May 6, 1995, the President issued Executive Order 12959 to take steps with respect to Iran in addition to those set forth in Executive Order 12957. See Exec. Order No. 12959, 60 Fed. Reg. 24757 (May 6, 1995). On August 19, 1997, the President issued Executive Order 13059 in order to clarify the steps taken in Executive Orders 12959 and 12957. See Exec. Order No. 13059, 62 Fed. Reg. 44531 (August 19, 1997) ("E.O. 13059").[1]

6. To implement Executive Order 13059, which itself was issued pursuant to the powers granted to the Executive under IEEPA, the Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions Regulations ("ITR"). See 31 C.F.R. Part 560. Absent permission from OFAC, the ITR prohibits, with very limited exception, among other things: (1) the exportation, reexportation, sale, or supply, directly or indirectly, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transhipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. Section 560.204); and (2) any transaction by any United States person that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITR (31 C.F.R. Section 560.203).

7. Under IEEPA, it is a crime to knowingly and willfully violate any regulation promulgated under IEEPA. See 50 U.S.C. § 1705(c). As noted above, the ITR was promulgated under IEEPA.

---

[1] At all times relevant to this Complaint, the President has continued the national emergency with respect to Iran, as reflected in Executive Orders 13059, 12959, and 12957. The most recent continuation of this national emergency was reflected in an Executive Order dated March 8, 2011. See 76 Fed. Reg. 13283 (March 11, 2011).

3

## II. THE DEFENDANT

8. Based on, among other things, my review of documents obtained from judicially authorized search warrants for certain communications (the "Search Warrants") and public source information, I understand that SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, was, at all times relevant to this Complaint, a Managing Director and part-owner of Innovative Technology System ("ITS"), and a part-owner of Skylinks FZC ("Skylinks"), and that as of 2011, GHORASHI owned approximately 90 shares of stock in "SKY LINKS FZC," out of a total of 300 outstanding shares in Skylinks. I also understand that GHORASHI had a managerial role at ITS and Skylinks, with supervisory authority over other employees.

9. Based on my involvement in this investigation, including my review of public source information, and other documents, I know that ITS and Skylinks are interrelated companies located in the United Arab Emirates. I have reviewed the website of ITS which contains a list of "ITS Group Companies," which includes "Skylinks." Based on communications that I have reviewed pursuant to the Search Warrants, I have also learned that several individuals maintain email addresses at both ITS and Skylinks, as well as other entities within the "ITS Group." The email address typically consists of the user's first name followed by an "@" and the company designation, such as, "itsystemsco.com" or "skylinks.ae."

10. Among other evidence with respect to GHORASHI's managerial positions at these companies, I have reviewed a printout of a LinkedIn profile for an individual named "Amin Ghorashi," which was printed on or about February 16, 2012, which lists "Ghorashi" as the "Managing Director, Innovative Technology Systems," located in the United Arab Emirates.[2] A 2011 Dun and Bradstreet report for ITS ("ITS D&B Report") lists "Amin Gorechi" as the Managing Director of ITS. Based on my training, experience, and participation in this investigation, I believe that "Amin Gorechi" is SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant. The ITS D&B Report also reports that "a legal agreement exists assigning

---

[2] Based on my review of Internet resources, including the website of LinkedIn and other websites describing the site's operation, I understand that LinkedIn is a social networking website used for professional networking. Users can create profiles on the site in which they provide their identifying information, such as name and employment history, and through LinkedIn, make contact with business associates as well as potential employers.

4

control of the business [i.e., ITS] to Amin Gorechi." A financial report issued by Dun and Bradstreet regarding Skylinks ("Skylinks D&B Report") also reflects that "Amin Ghorashi" is a director of Skylinks.

### III. ITS AND SKYLINKS'S BUSINESS OF EXPORTING GOODS TO IRAN

11. Based upon my review of numerous communications sent by or received by Skylinks and ITS employees, I believe that the vast majority of business transactions conducted by Skylinks and ITS involve the procurement of goods on behalf of Iran, including U.S.-origin goods.

   a. For instance, I have reviewed a communication sent from one co-conspirator working for Skylinks ("CC-1") to other co-conspirators employed by the company ("CC-2" and "CC-3") containing what appear to be charts summarizing Skylinks' business in the past several years. One chart appears to summarize all of Skylinks's business in the company's fifth year of operation, which I believe to be from in or about June 2010 to in or about June 2011. Of the thirteen deals listed for the year in the chart, seven are identified in the chart as being deals with the "consignee" in Iran.

   b. A second chart pertaining to Skylinks's business that is included in the same communication describes products sold from in or about October 2008 until in or about December 2011 to Informatics Services Corp., which I know from the review of other communications obtained through search warrant and through the company's website to be a company located in Iran. The chart reveals that Skylinks engaged in a high volume of business transactions with Informatics, referencing what appear to be over $1 million in transactions during a single year. This chart identifies 32 items as having been delivered to Iran from October 2008 until in or about December 2011. Of those 32 items, at least 22 appear to be products manufactured in the United States, based upon the identifying information provided in the chart.

   c. In addition, from reviewing communications sent to and from Skylinks and ITS employees (including, for example, shipping documents and invoices sent and received) I and other agents have identified approximately 30 transactions between 2008 and 2012 in which Skylinks or ITS has arranged for U.S.-made goods to be shipped to companies in Iran.

12. The Skylinks D&B Report and the ITS D&B Report provide additional evidence that the business of Skylinks and ITS includes shipping products from the United States to Iran.

5

Skylinks describes itself on its website as an entity that has the ability to supply telemetry technology including modems, antennas, broadcast equipment, and other satellite equipment, and claims to be capable of providing components manufactured in the United States. The Skylinks D&B Report also states that Skylinks exports goods to Iran.

13. Similarly, the ITS D&B Report also reflects that ITS "IMPORTS FROM," among other countries, the "United States," and that it "EXPORTS TO:-Iran." The ITS D&B Report does not list any other countries to which ITS exports.

## IV. CERTAIN IDENTIFIED SALES TO IRAN

14. As explained more fully below, my investigation has revealed that SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, through ITS and Skylinks, has arranged to export goods – including telemetry technology and electronics – from the United States to Iran, via Malaysia. GHORASHI, through and with his co-conspirators, certain employees of ITS and Skylinks and certain shipping companies associated with ITS and Skylinks, obtained some of these goods from a company based in Virginia Beach, Virginia ("SUPPLIER-1").

15. The investigation has shown that at no time did SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, obtain authorization from the Office of Foreign Assets Control for the shipment of goods from the United States to Iran described herein, nor did SUPPLIER-1 or the other entities involved in the shipment of goods for GHORASHI ever obtain such authorization.

### A. Evidence of GHORASHI's Knowledge of U.S. Export Regulations From Transaction With Virginia Company

16. Based on my review of documents obtained from a supplier of satellite-communications technology and hardware located in Herndon, Virginia ("SUPPLIER-2") pursuant to a subpoena, communications seized pursuant to the Search Warrants, and the other sources of information described below, I understand that, between approximately 2006 and 2009, SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, and other ITS/Skylinks representatives, obtained satellite communications equipment from SUPPLIER-2 and received those goods in Dubai. GHORASHI and others, however, ultimately re-shipped some of that equipment to a company in Iran in which GHORASHI has an ownership stake, and then took steps to conceal that re-shipment from SUPPLIER-2.

a. On or about November 18, 2005, SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, as a representative of ITS and its affiliates, signed a "Reseller Agreement" with SUPPLIER-2, pursuant to which ITS was designated as a "Reseller" for SUPPLIER-2, so that ITS and its affiliates could purchase products sold by SUPPLIER-2 and re-sell those products to other entities. The Reseller Agreement provided that:

i. "For all shipments to Reseller facilities outside of the United States . . . [Reseller will] comply[] with all requirements set forth in Section 13.7 below." Section 13.7 of the Reseller Agreement is titled "Export Control," and it provides that:

> Reseller shall comply with, and shall, at [SUPPLIER-2's] request demonstrate compliance with all applicable export laws, restrictions, and regulations of any United States or foreign agency or authority. Reseller shall not export or re-export, or allow the export or re-export of any product technology or information it obtains pursuant to this Agreement (or any direct product thereof) in violation of any such laws, embargoes, restrictions or regulations.

In addition to other pages of the Reseller Agreement, GHORASHI signed the page on which Section 13.7 is found.

ii. Exhibit B-2 to the Reseller Agreement relates to the purchase by ITS and its affiliates of certain software pursuant to the Reseller Agreement. That Exhibit contains a provision titled "Export Control," which states:

> As required by U.S. law, Customer [i.e., ITS] represents and warrants that it: (a) understands that the Software is subject to export controls under the U.S. Commerce Department's Export Administration Regulations ("EAR"); (b) is not located in a prohibited destination country under the EAR or U.S sanctions; (c) will not export, re-export, or transfer the Software to any prohibited destination, entity, or individual without the necessary export license(s) or authorization(s) from the U.S. Government.

In addition to other pages of the Reseller Agreement, GHORASHI signed the pages of the Reseller Agreement on which the foregoing provision appears.

b. On approximately June 22, 2006, ITS purchased

approximately $139,107 of electronic equipment used for satellite communication and data transfer, including: four 48-port LAN switches; three hub protocol processors; four hub, NMS single processors; and two KVM switches, 8 Port, ROHS, from SUPPLIER-2, for shipment to Skylinks in the United Arab Emirates.

   c.   On approximately July 14, 2006, ITS purchased fifteen Infiniti 5150 satellite routers from SUPPLIER-2, at a total cost of approximately $27,435, for delivery to Cybernet MEA (a company that shares numerous employees and directors with ITS) in Dubai, UAE.

   d.   On approximately August 30, 2006, ITS purchased 100 Infiniti 5150 satellite routers, from SUPPLIER-2, at a total cost of approximately $182,900, for delivery to Skylinks in Dubai, UAE.

   e.   On approximately June 30, 2007, ITS purchased approximately $150,000 of electronic equipment from SUPPLIER-2, including two KVM switches, 8 port, ROHS, for delivery to Cybernet MEA in Dubai, UAE.

   f.   On approximately December 3, 2008, Skylinks purchased approximately $17,500 of electronics from SUPPLIER-2, purportedly for delivery to Dubai, UAE.

   g.   Based on my training, experience, and participation in this investigation, I understand that the following items listed above: 48-port LAN switches; hub protocol processors; hub, NMS single processors; KVM switches; 8 Port, ROHS; and Infiniti 5150 satellite routers require some form of software to operate, and I further understand that those items, along with the other items purchased by ITS and Skylinks from SUPPLIER-2, as described above, could be utilized as part of a satellite communications network.

   h.   On August 26, 2009, SUPPLIER-2 sent a communication to a co-conspirator employed at Skylinks ("CC-4") asking, "Could you tell me what software your [█████████] Skylinks networks are running currently?" The same day, CC-4 forwarded the email to another Skylinks employee ("CC-9") and asked that employee to reply to SUPPLIER-2. The same day, CC-9 forwarded the email chain to GHORASHI and to a managing director and part owner of Skylinks ("CC-5"). In that communication, CC-9 stated, "please find below email from [SUPPLIER-2] we discussed. Kindly forward to right person at AryanSat to send me [or] just reply direct to [SUPPLIER-2 address]."

   i.   Based on my training, experience, and participation in this investigation, I believe that the term

"AryanSat" in CC-9's email refers to Aryan Satellite Inc. The website of Aryan Satellite reflects that Aryan Satellite is located in Tehran, Iran, and provides, among other things, satellite communications services. On the website, Aryan Satellite is often referred to as "AryanSat." I have reviewed records produced in response to a subpoena issued to a webhosting service provider for the domain name "aryansatellite.com." Those records reflect that an ITS email address that GHORASHI regularly uses is listed as one of two email contacts for the aryansatellite.com domain name. Moreover, the billing address for the subscriber of the aryansatellite.com domain name lists the card holder as "Amin Gh*******," which I believe to be a reference to SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant.

j. As noted above, I understand that certain of the electronics purchased by ITS and Skylinks as described above, can be used in the provision of satellite communication services, and that, to be so used, the items enumerated above would require the installation and use of software. Based on my training, experience, and participation in the investigation, I believe that, in the email referenced at paragraph (h) above, CC-9 asked GHORASHI and CC-5 to forward SUPPLIER-2's question concerning software to AryanSat, because the goods that Skylinks had purchased from SUPPLIER-2 were in fact supplied to AryanSat in Iran.

k. On August 28, 2009, GHORASHI replied to the communication from CC-9 described at paragraph (h), above, in which CC-9 was seeking information from Aryan Satellite regarding products purchased from SUPPLIER-2. Specifically, GHORASHI instructed CC-9 and CC-5, "Please be very careful about this subject. [CC-9], please call them directly and ask all the question, no email at all." Based on my training, experience, and participation in the investigation, I understand that GHORASHI was instructing CC-9 to be more careful about generating documents from which someone might be able to conclude that Aryan Satellite was utilizing the items purchased by ITS and Skylinks from the United States, and which were supposed to remain in the UAE. This in turn indicates to me that GHORASHI was aware that such reexports of the goods to Iran from Dubai both were illegal and prohibited by his agreement with SUPPLIER-2, which underscored GHORASHI's responsibility to comply with U.S. export law.

l. At or about the same time that ~~these~~ these communications occurred ~~[struck through text]~~, GHORASHI was specifically reminded by SUPPLIER-2 regarding the requirements of U.S. export law. In particular, on or about August 27, 2009, SUPPLIER-2 sent an email to GHORASHI stating, "attached to this

9

email is a letter from me to you emphasizing [SUPPLIER-2's] commitment to U.S. Export Controls and our request to you to be in full compliance with these laws, regulations and restrictions."[1] Attached to the email was a letter addressed to GHORASHI and CC-5 which stated:

> [SUPPLIER-2] would like to take this opportunity to remind Innovative Technology Systems (ITS) and Skylinks of the responsibilities agreed to between ITS and [SUPPLIER-2] in the Reseller's Agreement signed by both parties.

The letter further enumerated the provisions of the Reseller Agreement addressing export control restrictions and prohibitions, including section 13.7 of the agreement prohibiting export or re-export in violation of U.S. export law. The letter further explained that:

> A reexport [sic] as defined under U.S. law is to either transfer product from one country outside of the U.S. to another country outside of the U.S. or allowing such a transfer to take place. A reexport [sic] may require prior written authorization from the U.S. government before such a transfer takes place depending on the product and the country it is destined for.

The letter further stated that ITS and Skylinks were responsible for exercising "due diligence" under the Reseller Agreement, and that SUPPLIER-2 "expect[ed] that ITS and Skylinks fully comply with all aspects pertaining to U.S. export controls."

      m.    On or about August 31, 2009, GHORASHI replied to the email described in paragraph (j), above, and stated, "Acknowledged well and thanks for your mail. Kind Regards, Amin Ghorashi."

    B.    **2011 Beacon Receiver Shipment In Violation of IEEPA**

    17.    Based on my review of communications seized pursuant to the Search Warrants, as well as my review of documents obtained from SUPPLIER-1, I understand that from at least March 2011 through in or about July 2011, SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, and others known and unknown, purchased five



10

Beacon Receivers (hereinafter the "Receivers")[4] from SUPPLIER-1, a United States supplier, for the purpose of trans-shipping to an Iranian customer.

    a. Based on communications to or from Skylinks employees, I know that in March of 2011, CC-3 sent a communication to SUPPLIER-1, which is located in Virginia Beach, Virginia, requesting a price quote for five Receivers. The following month, a different co-conspirator employed by Skylinks and not named as a defendant herein ("CC-6") sent a communication to SUPPLIER-1 and copied, among others, CC-3, informing SUPPLIER-1 that $16,975 had been wired to SUPPLIER-1 "as payment for our PO SKL-11-P482." Based on documents obtained from SUPPLIER-1, I understand that "PO [Purchase Order] SKL-11-P482" corresponds to a Skylinks purchase order for five Receivers that is dated March 28, 2011. Based upon a wire transfer document obtained from SUPPLIER-1, I know that as part of this transaction, funds were wired into a bank account held by SUPPLIER-1, from a bank located in New York, New York.

    b. Based upon other communications sent to or from Skylinks employees, I know that the five Receivers were subsequently transported to Kuala Lumpur. Then, on or about May 1, 2011, CC-6 asked a co-conspirator who I believe coordinates shipments for Skylinks ("CC-7") to tell CC-6 when the "shipment," arrived in Kuala Lumpur (which I believe to be a reference to the Receivers) and stated "[t]his should be shipped together with the tracking controller to Iran."[5]

---

[4] Based on my training, experience, and participation in this investigation, I understand that a beacon receiver is a component used in satellite systems to detect and measure power signals related to satellite antenna positioning or satellite uplink controls. Beacon receivers ingest information about the satellite, such as tracking, identification and antenna polarity. Beacon receivers typically fit into a rack system alongside other components, including a host computer, that allow the receiver to produce digital or analog outputs that assist earth stations in controlling the satellite.

[5] Based on my training, experience, and participation in this investigation, I understand that tracking controllers are external hardware devices that work inside a satellite tracking systems. Tracking controllers allow earth stations to position and monitor satellite antenna arrays and radio frequencies and are typically networked with a host computer, a physical rotator controller and other earth station radio equipment.

11

        c. Two days later, CC-6 sent a communication to CC-8 concerning the "Skylinks Incoming Air Shipment from Virginia US to Kuala Lumpur for Beacon Receiver," which directed CC-8 to "speed up this shipment" because "it is needed in Iran ASAP."

        d. On or about May 5, 2011, GHORASHI, among others, received an e-mail communication indicating that the U.S. Government had detained the shipment of Receivers. In particular, CC-6 sent a communication on which GHORASHI was copied stating that Skylinks' "agent in US has been under investigation with US Defense because of our first shipment (tracking controller) which is now in Kuala Lumpur." CC-6 further stated that SHIPPER-1 requested that two documents, attached to the correspondence chain to which CC-6 was responding, be submitted to SHIPPER-1 before the shipment was sent. The attachments include a document calling for information including the "Ultimate Consignee" for the goods to be shipped and the "Country of Ultimate Destination."

        e. Based on documents I have obtained from SUPPLIER-1, including a completed "Shipper's Letter of Instruction" Form that bears the date May 5, 2011, I understand that SUPPLIER-1 subsequently received a form for the shipment stating, among other things, that Malaysia was the ultimate country of destination. The document is signed by a representative of SUPPLIER-1. Based on my training, experience and participation in this investigation, as well as my review of communications including those discussed above, I submit that the information contained on the "Shipper's Letter of Instruction" is not accurate in light of CC-6's earlier statements that the five Receivers were to be shipped from Kuala Lumpur to Iran.

        f. On or about May 12, 2011, SHIPPER-1 informed SUPPLIER-1 and several Skylinks employees that SHIPPER-1 would ship "the cargo" to Kuala Lumpur the following day. Thereafter, based on my review of communications sent to or from Skylinks employees, I understand that several Skylinks employees, including CC-3, CC-6, and CC-8, communicated regarding how to transport the items from Kuala Lumpur to Iran.

        g. On or about May 19, 2011, SUPPLIER-1 emailed CC-1 with a copy to CC-3 and CC-8, and requested that CC-1 complete an attached form required for US customs to release "purchase order SKL-11-P482," a reference to the purchase order for the five Receivers. Based on my training, experience and participation in this investigation, I understand that SUPPLIER-1 is requesting that Skylinks complete Form BIS-711 with respect to the Receiver shipment. Form BIS-711 is a form promulgated by the United States Department of Commerce, which requires, <u>inter alia</u>, disclosure of the identity and location of the ultimate recipient

of goods in a particular transaction, and also requires disclosure if the goods involved in that transaction are to be reexported to another country. Form BIS-711 also contains statements referring to the requirement that a license be obtained for the re-export of goods.

    h. Thereafter, on May 22, 2011, CC-6 sent a communication to SUPPLIER-1, with a copy to CC-5, as well as CC-3 and CC-1, which stated, in substance and in part, "as of now we do not have confirm customer for this so we can not fill up some of the information required in the form." I believe that statement to be false in light of the communications indicating that the Receivers were in fact being sent to Iran.

    i. On or about July 7, 2011, CC-8 sent a communication to CC-1 and CC-4 which stated, "Fyi" and forwarded a communication from a U.S. Customs official reporting that the customs hold on the Receiver shipment had been released and that SUPPLIER-1 was authorized to move the shipment. On July 8, 2011, CC-4 forwarded that communication to CC-5 and copied GHORASHI and CC-1, stating, "Dear [CC-5,] This may be of your interest as i don't have any goods oer [sic] there in this situation." Based on my training, experience, and participation in this investigation, I understand that, in the July 8 communication, CC-4 was alerting GHORASHI, CC-1, and CC-5 that the shipment to which CC-8 was referring was not one in which he was involved, and was notifying individuals whom he believed would be interested in the shipment that the goods had been released. More specifically, I believe that CC-4 was advising GHORASHI of the correspondence regarding shipment because GHORASHI exercised supervisory authority regarding the shipment of goods to locations including Iran.

    j. From subsequent communications to or from Skylinks employees, I understand that the Receivers were shipped to Kuala Lumpur before, according to one such communication, the Receivers were "forwarded to IKA," which I understand to be an abbreviation of "Tehran Imam Khomeini International Airport," located in Iran.

  C. **GHORASHI is Kept Apprised of Various Illegal Shipments of United States Goods to Iran**

    18. According to documents that I have reviewed, on or about October 22, 2011, CC-4 sent a communication to GHORASHI with the subject, "ACTIONS & DEALS MONITORING WE WILL DISCUSS TOMORROW." Attached to the communication was a spreadsheet titled "OCTOBER - TRACKING STATUS." The attachment contained a list under the heading, "SKYLINKS," which, in turn, contained the entries, "HNS 6 - Cargo in negotiation to be moved to Singapore

where next step [sic] are pre organised," and "SSPA paid, under production, ready 1st November [sic] will be shipped to HK if sea or Istanbul if air our new org for transhipment." Based on my training, experience, and participation in this investigation, including my review of communications seized pursuant to the Search Warrants, I believe that the foregoing communication reflects CC-4 arranging to discuss with GHORASHI pending transactions in which Skylinks was sending United States goods to Iran.

        a. I believe that the term "HNS 6" in the October tracking document refers to a shipping container full of network parts that Skylinks obtained in Atlanta, Georgia, and attempted to transship to Iran via Kuala Lumpur, Malaysia, but which was seized by Malaysian authorities before it left Malaysia. I have reviewed various communications (and their attachments) seized pursuant to the Search Warrants that are related to this shipment. Those communications and documents are dated from approximately July 20, 2011 through August 30, 2011. Among the materials I have reviewed are:

        i. A May 15, 2011 communication from CC-3 to CC-8 copying CC-4 titled, "HNS 6 STATUS REPORT," in which CC-3 reported that the shipment would be delivered to a customer in Iran, directly from the United States to Tehran, via Malaysia;

        ii. A June 12, 2011 waybill reflecting the HNS 6 goods being picked up in Atlanta, GA, and destined for Malaysia;

        iii. An August 15, 2011 communication from the planned recipient of the network parts in Iran, to CC-1 and copying CC-4 asking about the status of the HNS06 shipment;

        iv. An August 24, 2011, communication from CC-7 to CC-1 and copying CC-4, discussing the fact that the shipment had been seized by Malaysian authorities, and that those authorities had "not approved [the] shipment for transhipment to Iran as per US regulation[,] any [thing] exported from the United States, diversion contrary to U.States [sic] law prohibited."

        b. I believe that the term "SSPA" in the October tracking document refers to a shipment of Solid State Power Amplifiers ("SSPAs") that Skylinks obtained from a United States supplier in or about November 2011, and which were transhipped through Hong Kong to Iran. I have reviewed various communications (and their attachments) seized pursuant to the Search Warrants that are related to this shipment. Those communications and documents are dated from approximately March 17, 2011 through June 16, 2012. Among the materials I have reviewed are:

     i. a March 17, 2011 quotation from the California-based supplier and addressed to CC-3 for the SSPAs;

     ii. a September 27, 2011 cover memo and check signed by GHORASHI to pay for the SSPAs via an intermediary;

     iii. A September 29, 2011 communication from CC-4 to GHORASHI regarding a payment related to the SSPA shipment;

     iv. a "Shipment Detail Screen - Airfreight" reflecting that the SSPAs were to be picked up in Washington, DC, on or about November 15, 2012, to be delivered via air to Hong Kong; and

     v. A June 16, 2012 communication from an individual located in Tehran, Iran, to CC-4 reporting that the SSPAs were not functioning properly.

  19. I have reviewed a communication that was recovered pursuant to the Search Warrants, which stated, in substance, that attached to the communication was a "Skylinks trade license and the passport copy of Mr. Amin [and two individuals associated with Skylinks]." Also attached to the communication was a photocopy of a passport issued by the Commonwealth of Dominica to Seyed Amin Ghorashi Sarvestani. The photocopy of the passport also contained a photograph of the passport holder.

  WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of SEYED AMIN GHORASHI SARVESTANI, a/k/a "Amin Ghorashi," a/k/a "Amin Gorechi," the defendant, and that he be imprisoned, or bailed, as the case may be.

          _____
          Brian Surer
          Special Agent
          Federal Bureau of Investigation

Sworn to before me this
third day of October, 2012

_____
THE HONORABLE FRANK MAAS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

15